UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENVILLE DIVISION

| LARRY S. SMITH, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | 2:22-CV-00112-DCLC-CRW |
| | ) | |
| v. | ) | |
| | ) | |
| NEWPORT UTILITIES, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court to address Defendant Newport Utilities' Motion for Summary Judgment [Doc. 15]. Plaintiff Larry Smith responded in opposition [Doc. 21] and Defendant has filed a reply [Doc. 24]. These matters are ripe for resolution.

**I.     BACKGROUND**

Newport Utilities employed Plaintiff from August 15, 1998, through May 31, 2021 [Doc. 25, pg. 1]. Plaintiff performed several jobs in Defendant's electrical division during the years of his employment, and beginning in September 2014, he worked as a bucket foreman [Doc. 22, ¶ 1]. This required Plaintiff to repair damaged powerlines and perform maintenance related to electrical services for the community [*Id.* at ¶ 6]. Both the lineman and bucket foremen position are inherently dangerous and require utilizing significant tools and working around and with live powerlines. [*Id.* at ¶ 7].

Plaintiff was one of three bucket foremen who worked for Defendant [*Id.* at ¶ 2]. He was one of only two small bucket truck teams [*Id.* at ¶ 3]. Each member of this small bucket truck team was required to possess a CDL license for safety reasons [*Id.* at ¶ 5]. Plaintiff's job also required him to be available to respond to emergency situations and assist with power outages or

1

other hazardous conditions [*Id.* at ¶ 6]. While working for Defendant, Plaintiff risked "electrocution, explosions, breakages, and other conditions that can cause serious injury or death" [*Id.* at ¶ 8].

Plaintiff's work schedule was a two-week cycle, consisting of thirty-six hours the first week and forty-four hours the second week [*Id.* at ¶ 9]. Meeting this requirement often necessitated extended work hours during the day and overtime during the two-week cycle. Plaintiff, along with the other employees in his department, was required to be available to handle after-hours emergency situations for a scheduled period [*Id.* at ¶ 10]. This "stand-by" shift would occur from 5:00 p.m. to 7:00 a.m. and continued for one week. In his role as bucket foreman, Plaintiff was required to complete this stand-by shift every six weeks. This often required Plaintiff to work more than twenty-four hours at a time, and it is estimated that he worked these shifts at approximately 400 to 500 times during his employment with Defendant [*Id.*] As bucket foreman, Plaintiff needed to be available to report for overtime work within thirty minutes [*Id.*].

Between 2009 and 2010, Plaintiff began having episodes, during which he experienced brief periods of unconsciousness [Doc. 25, pg. 3], and in 2020, he suffered two such episodes at work [Doc. 16, pg. 1]. Plaintiff's episodes were unpredictable, and Plaintiff was unable to know how long each episode would last [Doc. 16, pg. 5]. In March 2020, during the first incident that occurred at work, Plaintiff lost consciousness for over one minute while driving a bucket truck, and the truck swerved out of its lane of travel [*Id.*]. Another lineman, Brandon Jenkins ("Mr. Jenkins") witnessed this episode, and concerned for Plaintiff's safety, reported the incident to their supervisor, Kevin Woods ("Mr. Woods") [*Id.*]. Mr. Woods instructed Plaintiff to visit his physician to assess his ability to work, and Plaintiff saw Dr. Conway [*Id.*] Dr. Conway determined that Plaintiff was safe to return to work but said that he had referred Plaintiff to a specialist

regarding "some health issues" [*Id.*]. Upon this recommendation, Mr. Woods scheduled Plaintiff for work [*Id.*].

On August 6, 2020, Plaintiff suffered another incident at work during which he lost consciousness [Doc. 16, pg. 6]. While working up in the bucket, a lineman looked down and saw Plaintiff lying facedown on the ground [*Id.*]. Plaintiff was unconscious, the lineman called for help, and responders transported Plaintiff to a hospital [*Id.*]. Defendant's Vice President of Human Resources, Connie Frisbee ("Ms. Frisbee") knew of previous similar incidents that Plaintiff suffered because of "return to work" slips she had reviewed during the Plaintiff's employment [*Id.*]. Based on these prior incidents, the March and August 2020 events, and Plaintiff's specialist evaluation, Ms. Frisbee became concerned about Plaintiff's ability to safely perform his job [*Id.*].

Following the August 2020 incident, Ms. Frisbee, who was concerned that Plaintiff had suffered two medical incidents close in time, instructed Plaintiff to see Dr. Marilyn Bishop (Dr. Bishop) [*Id.* pg. 6] to undergo a fitness for duty examination [Doc. 25, pg. 4]. Ms. Frisbee also gave Plaintiff FMLA paperwork do be filled out by Dr. Conway [*Id.* at 5]. Dr. Conway completed Plaintiff's FMLA paperwork, restricting Plaintiff from working for one month, from August 6, 2020, to September 10, 2020 [*Id.*].

On September 23, 2020, Dr. Conway notified Defendant that a neurologist had evaluated Plaintiff and that, "at this time," Plaintiff was not restricted from operating any vehicle [Doc. 25, ¶ 83]. However, Plaintiff was restricted from working more than nineteen hours of overtime during his thirty-six-hour week and no more than eleven hours of overtime during his forty-four-hour week [*Id.* at ¶ 85]. After reviewing Dr. Conway's report, Ms. Frisbee determined that as of September 23, 2020, Plaintiff was not able to perform the essential functions of his job and no reasonable accommodation was available other than extended medical leave [*Id.* at ¶ 87].

On October 19, 2020, Dr. Conway submitted paperwork to Defendant releasing Plaintiff to return to work on October 22, 2020, but restricted his working hours to 12 hours per day, 55 hours per week. This caused Ms. Frisbee to instruct Plaintiff to visit Dr. Bishop. Dr. Bishop evaluated Plaintiff on November 6, 2020, and she restricted Plaintiff for five months from operating company vehicles requiring a CDL [*Id.* at ¶ 94]. Defendant determined that they could not accommodate Plaintiff's hourly restrictions and Plaintiff's restriction from driving a bucket truck, noting that "standby, overtime, and being able to operate a bucket truck are all essential functions of Plaintiff's position" [*Id. at ¶* 97]. Because Defendant was unable to accommodate Plaintiff's work restrictions, Ms. Frisbee contacted Plaintiff on November 9, 2020, and informed him that he was eligible for extended FMLA [*Id.* at ¶ 97].

In November 2020, Plaintiff applied for long-term disability benefits after being on leave. During the application process, Plaintiff included a note from his neurologist, Dr. Arvo Kanna ("Dr. Kanna"), explaining that Plaintiff suffered from "complex partial seizures with impairment of consciousness." [Doc. 22-1, pg. 33]. Dr. Kanna reported that Plaintiff was restricted from operating a vehicle requiring a CDL for at least two years [Doc. 22-1, pg. 32]. Dr. Kanna also instructed that Plaintiff could not work more than sixteen hours a day, that he must have eight hours off for every sixteen hours worked, and that he could not work more than thirty-two hours in one week [*Id.* at pg. 38]. In his application, Plaintiff said that he was not able to complete his job duties based on his medical condition and that he was not released for work [Doc. 22, at ¶ 49]. Plaintiff also completed a disability questionnaire, in which he indicated that he suffered a medical condition that restricted him from operating vehicles requiring a CDL license [Doc. 22 at ¶ 51].

In April 2021, Dr. Bishop again evaluated Plaintiff and restricted him from working more than forty hours a week or taking any standby work [Doc. 22, at ¶ 52]. Plaintiff was cleared to

operate a vehicle requiring a CDL only if he worked forty hours or fewer per week [Doc. 25, pg. 12]. Ms. Frisbee discussed the results of the evaluation with Mr. Woods and Curtis Williamson (Mr. Williamson), Defendant's Electric Manager [*Id.* at 8, 12]. Ultimately, Defendant determined that there was no way to reasonably accommodate Plaintiff's restrictions because the essential functions of the bucket foreman position required an ability to work overtime, to report to work within thirty minutes, and to perform standby work [*Id.* at 9-10]. Defendant also determined that Plaintiff could not safely perform his job "without posing a direct threat of harm to himself or others" [*Id.*]. Accordingly, Defendant informed Plaintiff that he could voluntarily retire instead of facing employment termination [*Id.*]. In May 2021, Plaintiff voluntarily retired [*Id.*]. Defendant contends that at the time it asked Plaintiff to voluntarily retire, there were no other available positions for which Plaintiff was qualified [*Id.*].

Based on these facts, Plaintiff filed a Complaint [Doc. 1] in this Court on September 9, 2022, asserting claims under 42 U.S.C. § 12101, the Americans with Disabilities Act of 1990, as Amended ("ADA") and 29 U.S.C. § 2601, the Family and Medical Leave Act ("FMLA") [*Id.*]. Defendant now moves for summary judgment on both claims [Doc. 15].

## II.     LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The moving party bears the initial burden of demonstrating

that no genuine issue of material facts exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "come forward with significant probative evidence showing that a genuine issue exists for trial." *McKinley v. Bowlen*, 8 F. App'x 488, 491 (6th Cir. 2001). The nonmoving party "may not rest upon mere allegations or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the nonmoving party based on the record. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986).

### III. ANALYSIS

Plaintiff alleges Defendant discharged him because of his disability in violation of the ADA and interfered with his rights under the FMLA. The Court will first examine Plaintiff's claim that Defendant violated the ADA.

#### A. The Americans with Disabilities Act

The ADA provides that it is unlawful for an employer to "discriminate against a qualified individual on the basis of a disability" which includes the failure to make reasonable accommodations to disabled employees. 42 U.S.C. § 12112(b)(5)(A). An employer is also required to engage in an "interactive process" with an employee requesting a reasonable accommodation due to a disability "to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (quoting 29 C.F.R. § 1630.2(o)(3)). Plaintiff alleges Defendant failed to provide a reasonable accommodation for his disability and failed to engage in the interactive process to discuss reasonable accommodations [Doc. 21, pg. 3]. Defendant asserts that it is entitled to judgment as a matter of law on Plaintiff's ADA claim because

(1) Plaintiff posed a direct threat to the health and safety of himself and others because of his condition; (2) it could not reasonably accommodate Plaintiff's restrictions; and (3) it engaged in a sufficient interactive process [Doc. 16, pgs. 12–21]. The Court first addresses Defendant's alleged failure to accommodate.

### 1. Failure to Accommodate

"Employees can prove discrimination in two ways, either directly or indirectly, and each has its own test." *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022). "Direct evidence explains itself" and "does not require the fact finder to draw any inferences to reach the conclusion that unlawful discrimination was at least a motivating factor." *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916 (6th Cir. 2013). For failure to accommodate claims under the ADA, the direct evidence test applies. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020). Under that test, Plaintiff must show: "(1) that he is disabled, and (2) that he is 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Id.* at 417 (citations omitted). Defendant asserts that (1) Plaintiff was not otherwise qualified because he posed a direct threat of harm to himself and others and (2) assuming Plaintiff was otherwise qualified, it could not reasonably accommodate his medical restrictions. Both arguments are addressed in turn.

#### i. Otherwise Qualified

"A disabled employee is not "otherwise qualified" for a job if he poses a "direct threat" to the health or safety of others that a reasonable accommodation cannot eliminate." *Siewertsen v. Worthington Steel Co.*, 134 F. Supp. 3d 1091, 1106 (N.D. Ohio 2015), *aff'd sub nom. Siewertsen v. Worthington Indus., Inc.*, 783 F. App'x 563 (6th Cir. 2019). "The direct threat defense must be

based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Id.* (citing *Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 86 (2002)). Further, an employer cannot "disqualify an applicant simply because of a slightly increased risk of harm[,] … and the risk must be highly probable and the harm must be substantial." *Id.* (citing *Backhaus v. Gen. Motors LLC*, 54 F. Supp. 3d 741, 751 (E.D. Mich. 2014)). There are four relevant factors to the direct-threat defense: "(1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm." 29 C.F.R. § 1630.2(r).

In assessing Defendant's direct threat defense, the Court first must assess whether Defendant conducted an individualized assessment of Defendant's ability to safely perform the essential functions of his job based on objective medical judgment. *See Chevron U.S.A.*, 536 U.S. at 86; 29 C.F.R. § 1630.2(r). It is undisputed that following Plaintiff's two medical episodes that occurred at work within a short time during 2020, Defendant instructed Plaintiff to undergo a fitness for work exam [Doc. 25, pg. 4]. Plaintiff's physician also evaluated him and released him to work; however, Dr. Conway advised Defendant that a specialist had evaluated the Plaintiff [Doc. 16, pgs. 5-6]. With this information, Ms. Frisbee became concerned about Defendant being able to safely perform the essential functions of his job [*Id.* at pg.6]. Ms. Frisbee instructed Plaintiff to undergo an evaluation with Dr. Bishop, who examined Plaintiff on November 6, 2020, and restricted Plaintiff for five months from operating company vehicles requiring a CDL license [*Id.*].

Plaintiff included Dr. Kanna's March 2021 report in his application for long-term disability benefits [Doc. 16, pg. 8]. Dr. Kanna noted that Plaintiff suffered from "complex partial seizures with impairment of consciousness" [*Id.*]. Dr. Kanna reported that Plaintiff was restricted from

8

operating a vehicle requiring a CDL license for at least two years and placed limitations on the hours Plaintiff could work [*Id.* at pg. 9].  Dr. Kanna also restricted Plaintiff from working more than sixteen hours a day, that he must have eight hours off for every sixteen hours worked, and that he could not work more than thirty-two hours in one week [*Id.* at 8-9].

In April 2021, Dr. Bishop evaluated Plaintiff again and determined that he could not work more than forty hours a week [*Id.* at pg. 9].  Both Dr. Kanna and Dr. Bishop agreed that Plaintiff required limited work hours and could not operate a vehicle requiring a CDL license [*Id.* pgs.8, 9]. With these restrictions in place, Plaintiff could not perform the essential functions of his job as bucket foreman.  Defendant relied on the objective advice of multiple medical providers in making its assessment that Plaintiff could not continue to perform the essential functions of his employment.  Accordingly, Defendant performed a sufficient individualized assessment of Plaintiff's medical condition based on objective medical judgment. *See Chevron U.S.A.*, 536 U.S. at 86.  The Court now turns to the four factors relevant to the direct-threat defense.

The first factor in analyzing the direct-threat defense is duration of the risk.  *Backhaus*, 54 F.Supp.3d at 751 (citing 29 C.F.R. § 1630.2(r)). Plaintiff suffered from "complex partial seizures with impairment of consciousness" [Doc. 22, ¶ 19].  Moreover, "these episodes were unpredictable, and Plaintiff could not know when they were coming and how long they would last." [*Id.*].  Plaintiff posed a direct threat to himself and his fellow lineman in March 2020 when he suffered a medical episode and swerved the truck he was driving into the wrong lane of travel [*Id.* at ¶; Doc. 17-1, pg. 22].  Plaintiff again posed a direct threat in August 2020, when a fellow lineman, who was inside the raised truck bucket, saw the Plaintiff lying face down and unconscious [Doc. 22, ¶ 29].  Dr. Kanna restricted Plaintiff's work hours, and in his disability questionnaire, Plaintiff said that Dr. Kanna restricted him from operating any vehicle requiring a CDL [*Id.*at ¶

9

48; Doc. 22-1, pg. 32]. In April 2021, Dr. Bishop evaluated Petitioner and determined that Petitioner could not work more than forty hours a week, nor could he perform any standby duties [Doc. 22-1, pg. 39] It is also undisputed that since his retirement, Plaintiff has experienced approximately ten more seizures at random times [*Id.* ¶ 60].

The second factor to be considered is the nature and severity of the potential harm. *Backhaus*, 54 F.Supp.3d at 751 (citing 29 C.F.R. § 1630.2(r)). Plaintiff was required to operate bucket truck in response to power outages [Doc. 22, ¶ 6]. It is undisputed that the work was dangerous, and employees risked serious injury, including electrocution [*Id.* at ¶¶ 7—8]. Plaintiff was required to respond to emergency weather situations, and the conditions were hazardous [*Id.*]. Suffering a seizure or losing consciousness while operating a bucket truck or working near electrical wires is certainly a severe potential harm. If Plaintiff were to suffer an episode while operating a bucket truck or working near electrical wires, there is potential for a catastrophic accident. While Defendant did not harm himself or others during the two episodes at work during which he lost consciousness, Defendant had valid reasons to believe that Plaintiff was a serious potential threat to himself, or other employees, given the nature of his job.

Regarding the third factor, the likelihood that the potential harm will occur is heightened because of the dangerous and unpredictable conditions in which a bucket foreman or lineman is required to work. *See Backhaus*, 54 F.Supp.3d at 751 (citing 29 C.F.R. § 1630.2(r)). It is undisputed that "sleep deprivation" and/or "physical exhaustion" precipitated Plaintiff's seizures at work [Doc. 22, ¶ 34]. Plaintiff contends that because he caused no actual harm while suffering episodes at work, Defendant has failed to establish that it was likely harm would occur. However, the standard for the affirmative defense is not whether harm has occurred but rather whether the potential for harm is heightened. *See Backhaus*, 54 F.Supp.3d at 751 (citing 29 C.F.R. § 1630.2(r)).

10

Indeed, it is fortunate here that neither Plaintiff nor any of his fellow employees were harmed during one of his medical episodes.

The fourth factor for consideration is the imminence of the potential harm. *Backhaus*, 54 F.Supp.3d at 751 (citing 29 C.F.R. § 1630.2(r)). Again, it is undisputed that Plaintiff's condition is "unpredictable, and Plaintiff could not tell when they were coming or how long they would last." [Doc. 22, ¶ 22]. Dr. Bishop was willing to return Plaintiff to work on restricted hours; however, "sleep deprivation" and "physical exhaustion" contributed to Plaintiff's seizures [*Id.* at ¶ 34]. As previously discussed, the nature of Plaintiff's job was dangerous, unpredictable, and stressful. Plaintiff has experienced approximately ten more seizures at random times [*Id.* ¶ 60]. Thus, is it likely that Plaintiff would suffer more episodes while working if he remained employed with Defendant.

After considering 1) the duration of the risk, 2) the nature and severity of the potential harm, 3) the likelihood that the potential harm will occur, and 4) the imminence of the potential harm, the Court determines that Plaintiff was a direct threat to himself and other employees. Thus, the Court must now determine whether the threat could be eliminated by a reasonable accommodation.

### ii. Reasonable Accommodation

The ADA regulations define the term "reasonable accommodation" as, in relevant part, "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position[.]" 29 C.F.R. § 1630.2(o)(1)(iii). Reasonable accommodations may include the following: "[j]ob restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or

11

modifications of equipment or devices; . . . and other similar accommodations for individuals with disabilities." 29 C.F.R. § 1630.2(o)(2)(ii). Defendant asserts that it could not reasonably accommodate Plaintiff's medical condition because his restrictions would require elimination of essential functions of his job and there were no other positions available for which he was qualified [Doc. 16, pgs. 18–21].

Essential functions are "the fundamental job duties of the employment position the individual with a disability holds or desires" and "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). A job function is considered essential for several reasons, including but not limited to: (1) "the reason the position exists is to perform that function"; (2) the limited number of employees available among whom the performance of that job function can be distributed"; and/or (3) "[t]he function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." *Id.* at (n)(2). Evidence that a particular function is essential includes, but is not limited to:

> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> (iii) The amount of time spent on the job performing the function;
> (iv) The consequences of not requiring the incumbent to perform the function;
> (v) The terms of a collective bargaining agreement;
> (vi) The work experience of past incumbents in the job; and/or
> (vii) The current work experience of incumbents in similar jobs.

*Id.* at (n)(3).

Here, Defendant could not have made a reasonable accommodation that would eliminate Plaintiff's direct threat of harm because of the essential functions of the position. Plaintiff was one of three bucket foremen employed with Defendant [Doc. 22, ¶ 2]. The essential job functions of the bucket foreman position included supervising a two-person bucket team, operating a bucket

12

truck, possessing a CDL, provide service and electrical power to the community, and respond to power outages or other hazardous conditions [*Id.* at ¶¶ 3-7]. As a bucket foreman, Plaintiff risked electrocution, explosions, breakages, and other conditions that could lead to serious injury or death [*Id.* ¶ 8]. Plaintiff was required to be able to respond to emergency situations within thirty minutes [*Id.* at ¶ 15]. The position required extensive hours, overtime, and standby. The position's essential functions were stressful and unpredictable. It is undisputed that the bucket foreman's job description included the following: "work on standby rotation and be available to work during emergency power restoration"; "must be able to work extended hours beyond normal shift, evenings, weekends, and holidays during emergencies"; "must be able to report to work for emergency purposes in 30 minutes or less"; and "subject to overtime on short notice." [*Id.* at ¶ 16]. And in order to prevent seizures, Plaintiff's medical providers restricted him from working extended hours [*Id.* at ¶¶ 34, 35; Doc. 22-1, pg. 31]. Accordingly, there was no reasonable accommodation Defendant could have made to eliminate Defendant's being a direct threat to himself and his fellow employees.

Moreover, there were no other positions available for which Plaintiff was qualified. At the time Defendant asked Plaintiff to retire, there were four positions available: two lineman positions, a wastewater maintenance position, and a customer service position [*Id.* at ¶ 58]. For the same reasons that Defendant could not reasonably accommodate Plaintiff as a bucket foreman, Defendant could not accommodate in either of the two lineman positions [Doc. 16, pg. 20]. Defendant contends that Plaintiff lacked the necessary certification and training to perform the wastewater maintenance position [Doc. 24, pg. 6]. Plaintiff also lacked experience with computer-based systems and customer service required to perform the customer service position [*Id.*]. Also,

13

each of the positions required overtime, and as previously discussed, was not a restriction that Defendant could reasonably accommodate.

### 2. Interactive Process

The ADA "mandates an individualized inquiry in determining whether an [employee's] disability . . . disqualifies him from a particular position." *Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014). The individualized inquiry is an "interactive process" in which "both parties have a duty to participate in good faith." *Id.* In response to Defendant's motion for summary judgment, Plaintiff asserts that Defendant did not engage in an interactive process by refusing to meet with Plaintiff to discuss any medical restrictions and Plaintiff's return to work [Doc. 21, pg. 3]. Plaintiff contends that Defendant did not consider Dr. Conway's October 2020 releasing Plaintiff to return to work [*Id.*]. Defendant responds that this issue is precluded from review because the Plaintiff did not include it in the complaint [Doc. 16, pg. 21]. Regardless, the Court finds Plaintiff's argument is without merit.

Plaintiff completed a fitness for duty evaluation, and Ms. Frisbee reviewed Dr. Conway's and Dr. Bishop's evaluations [Doc. 22, ¶ 30]. Ms. Frisbee initiated the Family Medical Leave ("FML") process [*Id.* at ¶ 31]. In November 2020, Dr. Bishop recommended Plaintiff be placed on extended FML, and Ms. Frisbee notified Plaintiff that he qualified for extended FMLA [*Id.*, at ¶¶ 38, 42]. And in April 2021, Dr. Bishop again evaluated Plaintiff [Doc. 22-1, pg. 39]. Ms. Frisbee notified Plaintiff that Defendant was unable to accommodate Plaintiff's restrictions [*Id.*, at pgs. 40-41]. In lieu of termination, Defendant informed Plaintiff that he had the option to voluntarily retire [*Id.*]. Defendant clearly participated in an individualized inquiry when determining that Plaintiff was disqualified for employment. *See Rorrer*, 743 F.3d at 1040.

14

Case 2:22-cv-00112-DCLC-CRW   Document 31   Filed 04/17/24   Page 14 of 16   PageID #: 613

Based on the foregoing, Plaintiff has failed to establish that he is otherwise qualified because he was a direct threat to himself, and others, and Plaintiff has failed to establish that Defendant could have made a reasonable accommodation to eliminate such threat. Thus, Plaintiff is not entitled to ADA relief, and there is no genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 323.

**B.     Family and Medical Leave Act**

Defendant asserts that Plaintiff does not raise a viable FMLA claim [Doc. 16, pg. 23]. In the complaint, Plaintiff argues that Defendant violated his FMLA rights by denying his right to return to work in 2020 and by simply relying on its own regularly employed doctor, Dr. Bishop, to evaluate Plaintiff [Doc. 1, pg. 6]. In response to Defendant's motion for summary judgment, Plaintiff contends that disputed facts exist regarding his FMLA claim [Doc. 21, pg. 4].

The FMLA prohibits employers' acts that "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). To establish a prima facie claim for FMLA interference, a plaintiff must show: "(1) he is an eligible employee; (2) the defendant is an employer; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled." *Wysong v. Dow Chemical Co.*, 503 F.3d 441, 447 (6th Cir. 2007).

"An involuntary-leave claim arises under 29 U.S.C. § 2615(a)(1) when: 'an employer forces an employee to take FMLA leave when the employee does not have a 'serious health condition' that precludes her from working.'" *O'Connor v. Nationwide Children's Hosp.*, 219 F. Supp. 3d 673, 679–80 (S.D. Ohio 2016), *aff'd*, 723 F. App'x 321 (6th Cir. 2018) (quoting *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 449 (6th Cir. 2007)). However, "the employee's claim ripens

15

only when and if the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully forced to use FMLA leave in the past." *Id.*

Here, it is undisputed that Plaintiff had "complex partial seizures with impairment of consciousness" [Doc. 22, pg. 4]. Because of his condition, Dr. Conway filled out FML paperwork, and Defendant granted Plaintiff leave in August 2020 [Doc. 25, pg. 4]. In November 2020, Ms. Frisbee notified Defendant he was eligible for extended FMLA leave [Doc. 16, pg. 6]. At no point did Plaintiff request additional FMLA leave. Thus, Plaintiff has not alleged that he requested FMLA leave or that Defendant denied him FMLA leave because Plaintiff had already exhausted leave. *See O'Connor*, 219 F. Supp. 3d at 679–80. Accordingly, Plaintiff has failed to raise a viable FMLA claim, and there is no genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 323.

## IV.    CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment [Doc. 15] is **GRANTED** and Plaintiff's claims are **DISMISSED WITH PREJUDICE**. A separate judgment shall enter.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge